UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) |
| PODTBURG & SONS DAIRY, LLC | ) Case No. 09-27464 MER |
| EIN: 84-1086879 | ) Chapter 11 |
| | ) |
| Debtor. | ) |

## DISCLOSURE STATEMENT

## I.  INTRODUCTION

Dated: May 9, 2011

A.  <u>REORGANIZATION AND DISCLOSURE</u>.  On August 25, 2009, Podtburg & Sons Dairy, LLC ("Debtor"), filed its voluntary petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code.  Contemporaneously with the filing of this Disclosure Statement, the Debtor filed its Plan of Reorganization (the "Plan").  This Disclosure Statement relates to the Plan of Reorganization.

Chapter 11 is the principal reorganizational chapter of the Bankruptcy Code.  Pursuant to Chapter 11, a Debtor may reorganize its business and/or financial affairs while continuing to operate its business and retain possession of its property.  Attempts to collect pre-petition claims from a Debtor and any attempts to foreclose upon a Debtor's  property are stayed during the pendency of the bankruptcy proceeding.  The purpose of this Disclosure Statement ("Disclosure Statement") is to provide the holders of claims adequate information about the Debtor and its proposed Plan so that creditors can make an informed judgment about the merits of approving the Plan.  The Plan, if confirmed by the Bankruptcy Court, is the definitive, legally binding document.

"Adequate information" means information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, that enables a hypothetically reasonable investor typical of holders of claims or interest of the relevant classes established under the Plan to make an informed judgment about the Plan in order to vote either to accept or reject the Plan.

YOU ARE ENCOURAGED TO READ THE PLAN AND TO CONSULT WITH YOUR COUNSEL ABOUT IT.  CERTAIN CAPITALIZED TERMS USED IN THIS DOCUMENT ARE DEFINED IN THE PLAN OR IN THE BANKRUPTCY CODE.  THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, AND THE COMMISSION HAS NOT RENDERED AN OPINION UPON THE ACCURACY OR ADEQUACY OF ANY STATEMENTS CONTAINED IN THIS DOCUMENT. BANKRUPTCY COURT APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY BANKRUPTCY COURT APPROVAL OF THE PLAN.  IN THE EVENT THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT CONCERNING THE REPAYMENT OF CREDITOR CLAIMS OR THE TREATMENT OF THE DEBTOR'S INTEREST IN ITS PROPERTY, THE PROVISIONS OF THE PLAN SHALL CONTROL. PREVIOUS VERSIONS OF THE  PLAN AND DISCLOSURE STATEMENT SHOULD BE DISREGARDED.

B.   VOTING ON THE PLAN.  The Debtor has proposed a Plan which accompanies this Disclosure Statement as a means of reorganizing its financial affairs and paying its creditors.  A vote on the Plan is important.  The Debtor can implement the Plan only if it is confirmed by the Bankruptcy Court.  The Plan can be confirmed only if, among other things, it is accepted by the

2

holders of two-thirds in amount and more than one-half in number of the claims which actually vote on the Plan.  At least one impaired class must vote to accept the Plan.  In the event the requisite acceptances are not obtained from the impaired classes, the Court may nevertheless confirm the Plan if the Court finds that it is fair and equitable to the class or classes rejecting the Plan.  Under the Debtor's proposed Plan, Classes 2 through and including Class 8 are impaired and therefore are entitled to vote on the Plan.  Classes 1 and 9 are not impaired and therefore cannot vote on the Plan.

"Impaired" is defined by §1124 of the Bankruptcy Code.  Impaired means that the Debtor's Plan alters the legal, equitable or contractual rights to which such classes or interest entitles the holder of such claims or interest.  The holders of impaired claims which are also allowed claims (as defined in Article I, ¶ 1.2 of the Plan), or the holders in those classes of disputed claims which the Bankruptcy Court has temporarily allowed for voting purposes only are entitled to vote on the Debtor's  Plan.

You are not required to vote on the Plan, but only those votes actually received by the Debtor's  counsel on or before the close of business on the date set forth in the Court's Notice accompanying this Disclosure Statement will be counted either for or against the Plan.

The Court will hold a hearing on confirmation of the Plan and will, among other things, determine the result of the vote on the Plan.  The date and time of the Court's hearing on confirmation appears in the Court's Order sent to you along with this Disclosure Statement.

## II.  HISTORY OF DEBTOR

A.    <u>PRE-BANKRUPTCY HISTORY</u>.

Richard and Phyllis Podtburg have been in the dairy cow business since 1969, having worked for and with third parties. In 1984, Richard and Phyllis went out on their own and started

3

milking 80 cows as sole proprietors. In 1985, the herd grew to 160. Thereafter, in 1989, Richard and Phyllis formed the Podtburg and Sons Dairy General Partnership and their sons Jeff and Kenneth became partners along with Richard and Phyllis. At this time, the herd had grown to approximately 300 head. By 1995, the herd had increased to 550 head, and in 1999, the herd was approximately 800 head. In 2001, the Podtburgs increased the size of their herd still further as well as their operations and maximized the herd at 1500 head. In connection therewith, additional funds were borrowed from American AG, an additional milking barn was built, and the herd grew to approximately 1500 head.

The timing of Debtor's expansion could not have been worse. Shortly following the herd and facilities expansion, the 9/11 terrorist attacks occurred. The effects of 9/11 were pervasive to the economy generally, and in particular had an extremely adverse impact on dairy farming. Podtburgs, doing business as a different entity, were forced to file for Protection under Chapter 11 bankruptcy and had a confirmed plan, which restructured their secured debt, the IRS debt, and a partial pay out to the unsecured creditors. Podtburgs satisfied the requirements of the Plan.

In 2005, Podtburgs formed Podtburg & Sons Dairy, LLC. Podtburgs were milking 1500 head of cows which were 1000 head owned by Podtburgs with 500 rented from third parties. Also, in 2005, Podtburgs refinanced their cattle and real estate loans from American National Bank to New Frontier Bank in Greeley. In 2008, Podtburgs entered into a capital lease/purchase arrangement with Dyecrest Dairy, LLC to purchase additional dairy cows.

In 2009, the economy deteriorated which impacted the dairy economy substantially. The falling of the economy brought the milk price well below break even of handling all expenses and payments. Even though Podtburgs were not able to make full payments, they were able to maintain a good relationship with all of their creditors except Dyecrest Dairy, LLC. In July

4

2009, Dyecrest filed a replevin against Podtburgs to take cattle sold to Podtburg back. This replevin was filed even though Debtor was current with Dyecrest. This action forced Debtor to file for protection under Chapter 11 Bankruptcy to allow Debtor time to restructure its debts.

In September 2009, Debtor was informed that their loans with New Frontier Bank were sold to First Amherst Financial Partners, LLC. In the fall of 2009, Podtburgs began negotiating with First Amherst Financial Partners, LLC to develop a restructure arrangement on the debts. Podtburgs developed the plan of selling the lactating cows into the CWT program. With the proceeds from the sale and CWT, Podtburgs paid down a substantial amount of the Amherst debt and had a payoff settlement with Dyecrest. Podtburgs were able to keep $550,000 of the proceeds with a portion of the funds to purchase 315 dairy cows to begin milking again in January 2010 and the balance being used as operating capital as the operation restarted. Podtburgs also owned 865 head of heifers that will be put into the milk herd as they freshen.

After pay downs on the Amherst debt, Amherst agreed to rewrite their debt to $1.400.000 and amortize the debt. Secured debts with FSA, John Deere, and GE Capital will also be restructured with a full pay out. Due to the taxes created from the sell of the Podtburgs herd, a tax liability of $80,000 will be due in 2011. This will be paid from operations. Podtburgs will be able to pay the unsecured creditors 15 cents on the dollar or $83,000 in 3 annual payments starting December 2011.

B.    POST-PETITION. The Debtor has continued its operations in the normal course of business.

C.    EXPECTED OPERATIONS. The plan of reorganization that Podtburg & Sons Dairy, LLC is presenting is designed to utilize all of its productive and non-productive assets to maximize the repayment of the secured and unsecured creditors to its best ability. The plan

5

takes into consideration the present value and future productive cash flow ability of the cattle and the real estate. The long term sustainable plan minimizes the creditor's losses and maximizes their return.

Following the confirmation of the Debtor's proposed Plan, the Reorganized Debtor will operate its business, manage its financial affairs, and pay its secured and unsecured creditors with allowed claims from Available Cash and from its ongoing business operations.

At the time of the filing of its Petition, Debtor had approximately 20 employees and revenues of approximately $350,000 a month. Also, at the time of filing, Debtor was milking approximately 1000 owned cows and 400 leased cows. That herd level was reduced to 0 as part of the CWT buyout.

In January 2010, Podtburgs started milking 150 cows from the 315 cows and heifers they purchased as well as the cows going in to the milk herd from the 865 head of heifers they owned. They also had 330 head of heifers that they were raising for other people that they started milking as these heifers moved into the herd.

The number of heifers entering into the cow herd has continued to increase monthly. In February 2011, Podtburgs have 842 cows on the milk line. Podtburgs monthly revenues are at $285,000. Gross revenues are reduced, but the variable expenses are reduced proportionately. Also, with the reduced and restructured debt, Debtors' break even does not require as many cows on the milk line and they are able to meet their obligations.

Debtor anticipates continuing its operations post-petition consistent with the foregoing.

After confirmation of Debtor's proposed Plan, the monthly salaries of Debtor's members shall remain the same, which are as follows:

(1) Richard Podtburg - $1,500 a month.

(2) Phyllis Podtburg - $1,500 a month.

(3) Jeff Podtburg - $2,800 a month.

(4) Kenneth Podtburg - $2,800 a month.

D.     STATUS DURING CHAPTER 11.  The Debtor has been managing its financial affairs and operating its business under Chapter 11 since it filed for bankruptcy relief.  The Debtor has filed Monthly Financial Statements with the office of the U.S. Trustee and the Bankruptcy Court as required by the operating guidelines of the U.S. Trustee's Office.

Debtor's performance while in Chapter 11 from March 31, 2011, the most current reporting, has been reported to the Office of the U. S. Trustee and is attached hereto as Exhibit "A."  The Debtor attended a §341 Meeting of Creditors and also a status and scheduling conference conducted by the Bankruptcy Court.  As required by the Bankruptcy Code, the U.S. Trustee scheduled an organizational meeting for an Official Unsecured Creditors' Committee. An Official Unsecured Creditors' Committee was not appointed by the U.S. Trustee in this Chapter 11 bankruptcy proceeding.  The Debtor also negotiated with First Amherst Financial Partners, LLC and Dyecrest Dairy, LLC the interim use of cash collateral, and has generally performed its duties as required under Chapter 11.

E.     ABILITY TO FULFILL TERMS OF PLAN.  The Debtor has been operating in its normal course of business.  As of March 31, 2011, the Debtor reported having approximately $37,842 in its operating account.  Projections have been made by the Debtor's accountant, Ronald Nolde, which indicate that the Debtor will have sufficient funds to implement all aspects of its Plan.  Those projections are attached hereto as Exhibit "B", and incorporated herein by reference.

7

### III.  DESCRIPTION OF DEBTOR'S ASSETS

As of the date of the filing of the bankruptcy petition, the Debtor's assets consisted of real and personal property used in its ongoing business operations, the specifics of which were listed on the Debtor's Schedules.  The Debtor believes that the present fair market value of all of the assets total approximately $1,978,325.  Attached hereto as Exhibit "C" is the initial balance sheet of the Debtor filed after the Petition Date, setting forth the Debtor's assets at the time of filing this Chapter 11 petition.  Debtor's most current balance sheet is attached hereto as Exhibit "D".  Since the date of the filing of its bankruptcy petition, the Debtor has retained possession of its assets.

The Debtor owns land in Weld County, Colorado.  The Debtor estimates that its fair market value is presently $23,000 as set forth in its Chapter 11 schedules.  The Debtor also owns equipment and inventory, which along with expected cash, receivables, and its equity interests, which it values at $1,955,325.  This amount reflects the fair market value and should not be confused with the book values shown on the Debtor's Balance Sheet of March 31, 2011.

### IV.  PENDING LITIGATION AND CONTROVERSIES

A. PRE-PETITION.  Prior to the Debtor filing its bankruptcy petition, it was named as a defendant in a replevin action brought by Dyecrest Dairy Limited Liability Co. in the Weld County, Colorado District Court.  The action was stayed when the Debtor filed its Chapter 11 proceeding.

8

B. <u>PREFERENCE AND/OR FRAUDULENT CONVEYANCE CLAIMS</u>. The Debtor is presently unaware of any preference or fraudulent conveyance claims, but will pursue any which are appropriate to pursue.

## V.  EXPECTED OPERATIONS AFTER IMPLEMENTATION OF DEBTOR'S PLAN OF REORGANIZATION

A.      <u>General</u>.  Following confirmation of its Plan, the Debtor intends to continue to operate its business.  Richard Podtburg, Phyllis Podtburg, Jeff Podtburg and Kenneth Podtburg will remain as members of the Debtor.   Their  compensation will be as follows:

| | |
|---|---|
| Richard Podtburg | $1,500 per month. |
| Phyllis Podtburg | $1,500 per month. |
| Jeff Podtburg | $2,800 per month. |
| Kenneth Podtburg | $2,800 per month. |

The Debtor's Post-Confirmation reports will be filed by Ronald Nolde, the Company's accountant.

B.      <u>Debtor's Property</u>.  Following confirmation of its Plan, the Debtor's property will be transferred to a the Reorganized Debtor.

C.      <u>Executory Contracts and Leases</u>.  All leases and executory contracts necessary to the operations will be assumed, and those not necessary will be rejected prior to confirmation.

## VI.  DESCRIPTION OF THE PLAN

A.  <u>EFFECTIVE DATE</u>.  A copy of the Debtor's Plan accompanies this Disclosure Statement.  The Plan provides for the creation of eight (8) creditor classes and a single class (Class 9) for the holders of equitable interests in the Debtor.  The "Effective Date" for the Plan has been defined in the Plan to mean 60 days following the Confirmation Date.  The Effective Date in this case means that on such date, the Debtor will commence implementation of its Plan.  The Debtor cannot advise the creditors of a date certain which will be the Effective Date because it is contingent upon proceedings established by the Court, but for purposes of this Disclosure Statement will estimate it to be August 1, 2011.

B. <u>CLASSES OF CREDITORS</u>

The Debtor estimates that it will owe the following Classes and allowed Chapter 11 administrative expense claimants the following approximate amounts as of the Effective Date:

1.      <u>Class 1:</u>  Weld County, Colorado Treasurer's Office. (Secured) $350.

2.      <u>Class 2:</u> First Amherst Financial Partners, LLC. (Secured) $1.4 million.

3.      <u>Class 3:</u> GE Capital. (Secured) $26,382.

4.      <u>Class 4:</u>  U.S.A. acting through the Farm Service Agency (FSA).  (Secured) $176,243.

5.      <u>Class 5:</u>  U.S.A. acting through the Farm Service Agency (FSA).  (Secured) $514,446.

6.      <u>Class 6:</u> John Deere. (Secured) $94,358.

7.      <u>Class 7:</u>  Hitachi Capital America Corp. (Secured) $13,742.

8.      <u>Class 8:</u>  Debtor's unsecured creditors. (Unsecured).  $556,723.

9. <u>Class 9</u>: Equitable interests in LLC. $0.00.

B. <u>UNCLASSIFIED ADDITIONAL ADMINISTRATIVE EXPENSES</u>:

The following administrative expenses are expected in addition to retainers already received by the professional persons:

| | | |
|---|---|---|
| 1. | Weinman and Associates, P.C. (Admin.) | $15,000.00 |
| 2. | Otten Johnson Robinson Neff & Ragonetti, PC (Admin.) | $10,000.00 |
| 3. | U.S. Trustee's Fees (Admin.) | $0.00 |
| 4. | Administrative Expense of Gavilon, LLC | $6,081.24 |

C. <u>CLASSIFICATION OF CLAIMS AND IMPAIRMENT OF CLASSES</u>.

1. <u>Classification</u>. Pursuant to the requirements of 11 U.S.C. §1123 of the Bankruptcy Code, the Debtor has classified the claims of its creditors under its proposed Plan of Reorganization. The Debtor has made this classification pursuant to the requirements of the Bankruptcy Code. Each class of claims which has been established under the Plan consists of claims which are substantially similar and with respect to each claim contained in each class, the Plan provides for the same treatment for each class or interest of each particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its particular claim or interest.

2. <u>Impairment</u>. As required pursuant to 11 U.S.C. §1123 of the Code, the Debtor has not identified in its Plan any classes of claimants which are impaired under the Plan. The Plan provides that with respect to impairment of classes, should any dispute arise as to whether or not a class of claim is impaired, resolution of such

11

issues shall be made by the Bankruptcy Court after an opportunity for notice and a hearing as required under the Bankruptcy Rules.

D.      <u>CLASSES OF CLAIMS AND INTEREST ESTABLISHED UNDER THE PLAN</u>.

The classes established under the Plan and the proposed treatment for the repayment of the claims in each class are described below.

1.      <u>Class 1</u> consists of the allowed priority claim of the Weld County, Colorado Treasurer's Office for taxes due .  Class 1 is not impaired under the Plan. The claim is for unpaid taxes in the amount of $350.  The Plan proposes to pay the Class 1 creditor in full and in cash on the Effective Date of the Plan.  The Class 1 creditor will retain all statutory rights available to it.

2.      <u>Class 2</u> consists of the allowed secured claim of First Amherst Financial Partners, LLC in the approximate amount of $1.4 million.  Class 2 is impaired under the Plan. The claim is secured by the Debtor's land, cattle, crops, feed, silage and hay.  The claim will be paid in monthly payments of interest only until April 1, 2012.  At that time, the balance is amortized for 360 monthly payments of principal and interest, with a balloon payment due on March 1, 2013. Interest is floating and is tied to the Milk Price.  Interest is currently projected at 8% per annum. First Amherst Financial Partners, LLC will retain its lien in the Debtor's Assets securing its claim to the same extent and in the same priority as its pre-petition lien.  Each monthly payment of interest is estimated to be $8,167.

The deficiency unsecured claim of the Class 2 creditor in the approximate amount of $2.4 million will be subordinated to the claims of the Class 8 creditors for purposes of distributions to the Class 8 creditors, provided the Plan is confirmed.

12

3.      Class 3 consists of the allowed secured claim of GE Capital in the approximate

amount of $26,382.  Class 3 is impaired under the Plan.  The claim is secured by the Debtor's

vehicles and equipment.  The claim will be paid in monthly payments of principal and interest at

5% per annum amortized over 5 years with the first payment due on the Effective Date and

continuing monthly thereafter.  Each monthly payment will be in the approximate amount of

$231.  GE Capital will retain its lien in the Debtor's Assets securing its claim to the same extent

and in the same priority as its pre-petition lien.

4.      Class 4 consists of the allowed secured claim of the U.S.A. acting through the

Farm Service Agency (FSA).  Class 4 is impaired under the Plan.  The U.S.A. acting through the

Farm Service Agency (FSA) is owed approximately $176,243.  The claim is secured by the

Debtor's equipment.  The claim will be paid in monthly payments of principal and interest at 2%

per annum with the first payment due on the Effective Date and continuing monthly thereafter.

Each monthly payment will be in the approximate amount of $747.  FSA will retain its lien in the

Debtor's Assets securing its claim to the same extent and in the same priority as its pre-petition

lien.

5.      Class 5 consists of the allowed claim of the U.S.A. acting through the Farm

Service Agency (FSA).  Class 5 is impaired under the Plan.  The U.S.A. acting through the Farm

Service Agency (FSA) is owed approximately $514,446.  The claim is secured by the Debtor's

equipment.  The claim will be paid in monthly payments of principal and interest at 2% per

annum with the first payment due on the Effective Date and continuing monthly thereafter.  Each

monthly payment will be in the approximate amount of $2,307.  FSA will retain its lien in the

Debtor's Assets securing its claim to the same extent and in the same priority as its pre-petition

lien.

6.      Class 6 consists of the allowed secured claim of John Deere in the approximate amount of $94,358.  Class 6 is impaired under the Plan.  The claim is secured by the Debtor's equipment.  The Debtor and John Deere entered into an Agreement to repay this claim.  The Agreement is incorporated into the Plan.  A copy of the Agreement is attached to the Plan as Exhibit "1".  The Debtor will make monthly payments of $3,000 to John Deere which will retain its lien(s) securing its claim to the same extent and in the same priority as its pre-petition lien.

7.      Class 7 consists of the allowed secured claim of Hitachi Capital America Corp. in the approximate amount of $13,742.  Class 7 is impaired under the Plan.  The claim is secured by the Debtor's equipment.  The Debtor and Hitachi Capital America Corp. entered into an Agreement to repay this claim.  The Agreement is incorporated into the Plan.  A copy of the Agreement is attached to the Plan as Exhibit "2".  The Debtor will make monthly payments of $300 to Hitachi Capital America Corp. which will retain its lien(s) securing its claim to the same extent and in the same priority as its pre-petition lien(s).

8.      Class 8 consists of the allowed unsecured claims of the Debtor's unsecured creditors.  Class 8 is impaired under the Plan.  Allowed Unsecured Claims include those claims listed on the Debtor's initial schedules as not being "disputed, "contingent" or "unliquidated", or which may be asserted by the filing of Proofs of Claim to which the Debtor, after examination, will not file an objection.  The Class 8 creditors  will be paid a total sum of $83,000 in three (3) annual Pro Rata distributions of  $27,666.  The first distribution will be on December 31, 2011 and annually thereafter for two (2) additional annual distributions.  Those claims which are disputed will be paid within 30 days after a final order of the Court determining the amount of the claim, or within 10 days of agreement between the Debtor and claimant as to the amount of the claim.  Upon payment to a creditor, that Class 8 creditor will have no further claim against the

14

Debtor or its property.  The Debtor estimates that total unsecured claims equal $556,723.  First Amherst Financial Partners, LLC, which acquired its claim from the FDIC as receiver of New Frontier Bank, has an estimated unsecured deficiency claim in the approximate amount of $2.4 million.  The Debtor had listed the unsecured claim of the FDIC at $1,971,973.  Deducting this amount for total unsecured claims in the amount of $2,528,696 results in unsecured claims totaling $556,723.  Had First Amherst Financial Partners, LLC not agreed to be subordinated, the distribution to Class 8 unsecured creditors would be approximately 3%.  Each unsecured creditor is estimated to receive approximately 15% of its claim.  A listing of the Class 8 unsecured creditors is attached hereto as Exhibit "E".

       9.    Class 9 consists of the membership interests in the Debtor.  These interests will be retained following confirmation of the Plan subject to the terms of the Plan.  Class 9 is not impaired under the Plan.

E.  UNCLASSIFIED ADMINISTRATIVE EXPENSES.

       Unclassified Administrative Expenses are identified as follows:

       Chapter 11 Administrative Expenses.  Administrative Expenses include fees and costs of Professional Persons, i.e., the Debtor's bankruptcy counsel, Weinman & Associates, P.C., and the Debtor's Special Counsel, Otten Johnson Robinson Neff & Ragonetti, P.C. as approved by the Court since the filing of the Debtor's bankruptcy petition.  Administrative Expenses also include any statutory fees payable to the U.S. Trustee assessed under 28 U.S.C. §1930(a)(6).  Any unpaid fees owing to the U.S. Trustee must be paid in full on the Effective Date of the Plan.  The Debtor's obligations to remit quarterly fees to the U.S. Trustee continues until the Debtor's Chapter 11 case is dismissed, converted or closed.

Administrative Expenses also include fees and expenses arising after the filing of the bankruptcy petition as a result of the Reorganized Debtor's ongoing expenses of implementing its Chapter 11 case. Such expenses include actual and necessary expenses associated with the administration of the bankruptcy estate including necessary business expenses, and post-petition tax obligations owing to various taxing authorities.

Gavilon, LLC has an allowed administrative expense claim in the amount of $6,081.24. This administrative expense will be paid in monthly payments of principal and interest with interest at 5% per annum amortized over 5 years with the first payment to be made on the Effective Date and continuing monthly thereafter. Each monthly payments will be approximately $115.00.

Weinman & Associates, P.C., has been authorized by the Court to be hired as a Professional Person, and is the Debtor's general bankruptcy counsel. Weinman & Associates, P.C., received a retainer from the Debtor in the amount of $35,000. $12,500 of the retainer was transferred to Otten Johnson Robinson Neff & Ragonetti to retain their services. The Debtor anticipates that it will owe Weinman & Associates, P.C. an additional $15,000 for services provided for the period following the filing of the petition and up to confirmation of its Plan. Weinman & Associates, P.C. will be paid on the Effective Date, or from ongoing business operations for services provided and to be provided.

Otten Johnson Robinson Neff & Ragonetti, PC has been authorized by the Court to be hired as a Professional Person, and is the Debtor's Special counsel. Otten Johnson Robinson Neff & Ragonetti, PC was assigned specific matters, primarily the negotiation of the use of cash collateral with First Amherst Financial Partners, LLC and Dyecrest Dairy, LLC. Otten Johnson Robinson Neff & Ragonetti, PC received a retainer of $12,500 upon hiring from the retainer

16

given to Weinman & Associates, P.C.  The Debtor estimates that at confirmation of its Plan, it

will owe Otten Johnson Robinson Neff & Ragonetti, PC  an additional $10,000 for the period

following the filing of the petition and up to confirmation of its Plan.

The Administrative Expenses identified above are subject to approval by the Bankruptcy

will be paid from the Debtor's ongoing business operations.  The Debtor will make payments to

Weinman & Associates, P.C. and Otten Johnson Robinson Neff & Ragonetti, P.C. pursuant to the

interim fee order already entered by the Court and subject to final fee application, which must be

approved by the Court.

Any other administrative claimant shall file an application for payment of administrative

expenses prior to the time the case is closed.

Administrative Expenses also include business expenses incurred by the Debtor-in-

Possession in connection with the Chapter 11 bankruptcy case and arising from its ongoing

business operations.  These expenses include quarterly fees owing to the U.S. Trustee Program.

Since the filing of its bankruptcy petition, the Debtor has remained current with respect to

payment of its Chapter 11 bankruptcy expenses including fees to the U.S. Trustee and its business

expenses and any post-petition obligations owing to taxing authorities.  Should any of these

expenses remain unpaid as of the date of confirmation, the Plan provides payment in full on the

Effective Date.

## VII.  RISK FACTORS

The Debtor proposes to pay its unsecured creditors from Available Cash.  Several factors

could adversely affect the Debtor which in turn could impact the Debtor's performance under its

Plan.  These factors may include the following:

(1)     The Bankruptcy Court may deny confirmation of the proposed Plan.

(2)     The Bankruptcy Court may not confirm the Debtor's Plan as projected and the Effective Date of the Plan may be delayed, which could delay the distributions to the various creditor classes under the Plan.

(3)     The Available Cash may not be sufficient to pay all of the Administrative and Priority claims such that an amount less than $83,000 would be available to pay unsecured claims.  In such a situation, the unsecured creditors may receive less money, no money, or be delayed in the time of payments.

## VIII.  EFFECT OF CONFIRMATION OF THE PLAN ON DEBTOR AND CREDITORS

The terms of the confirmed Plan will bind the Debtor and all of its creditors with respect to payment of such claims whether or not the holders of such claims vote to accept the Plan. However, creditor claims against the Debtor's general partners pursuant to state law shall remain unaffected by the Confirmation Order.

## IX.  COMPARISON OF PLAN TO LIQUIDATION UNDER CHAPTER 7

The Debtor projects that under its Plan, the Debtor's general unsecured creditors (with allowed claims) in Class 8 will realize a return of approximately 15% of their allowed unsecured claims.  The Debtor estimates that liquidation under Chapter 7 of the Bankruptcy Code would result in a payment to general unsecured creditors of 0%.

18

Under Chapter 7 of the Bankruptcy Code, a Chapter 7 trustee would be appointed to liquidate the Debtor's assets. Under such a scenario, the Debtor's business would cease to operate.

The Bankruptcy Code requires that a Trustee move as expeditiously as possible to administer and close the case. This would mean that a Trustee would sell any unencumbered assets hoping to realize cash for the payment of creditors. The Debtor believes that there are no unencumbered assets which can be sold to help pay unsecured creditor claims. The Debtor may have accumulated cash which a trustee could utilize to pay claims, but such funds are subject to secured creditors' security interests. Any money collected by the trustee would first need to be utilized to pay allowed Chapter 7 administrative expenses, allowed Chapter 11 administrative expenses, creditors who have dealt with the Debtor since the filing of its Chapter 11, priority wages and priority taxes incurred by the Debtor before and since filing the petition, and finally unsecured creditors. Conversion of the case to Chapter 7 would increase administrative expenses and decrease to zero the amount of any cash available to pay unsecured creditor claims. As such, there would be no assets available to pay general unsecured claims after payment of secured creditors, Chapter 7 administrative expenses, Chapter 11 administrative expenses and unsecured priority claims. A liquidation analysis is attached hereto as Exhibit "F".

## X.  BEST INTEREST OF CREDITORS

The Bankruptcy Code provides that in order to confirm its Plan of Reorganization, the Debtor must satisfy the "best interest of creditors test". Simply stated, this test requires that each holder of an impaired claim or interest must either vote to accept the Debtor's Plan or receive

what such holder would receive in a hypothetical Chapter 7 liquidation under the Bankruptcy Code.

The Debtor's proposed Plan meets this requirement of the Bankruptcy Code since each creditor of the Debtor will receive at least as much, if not more (general unsecured creditors projected to receive 15% of claims) than they would receive in a Chapter 7 liquidation case (where unsecured creditors are projected to receive 0% on allowed unsecured claims).

## XI. CRAMDOWN UNDER THE PLAN

If an impaired class does not accept the Plan, the Plan can be "crammed down" or forced on such class upon a showing that the Plan is "fair and equitable". The concept of cramdown of the Debtor's Plan is best summarized as follows: If a holder of a secured claim objects to confirmation of the Plan, the Plan may be confirmed over such objection if the secured creditor realizes the indubitable equivalent of its secured claim. If an unsecured creditor objects to the Plan, the Plan may be confirmed over that objection if: (1) the unsecured creditor is receiving under the Plan at least what it would receive in a Chapter 7 liquidation, and (2) the holders of any claims or interest junior to the unsecured creditors (i.e., Shareholder of the Debtor), will receive nothing until unsecured creditors are paid in full. This rule is known as the "absolute priority rule" in bankruptcy. It is the opinion of the Debtor that with respect to its secured creditors, its proposed Plan is fair and equitable since the secured creditors will be paid the allowed amount of their secured claims with interest following confirmation of the Plan. With respect to the Debtor's unsecured creditors, the Debtor believes that it will not meet the fair and equitable test because the Plan violates the absolute priority rule. It is estimated by the Debtor that unsecured creditors will receive a 15% repayment on their allowed unsecured claims. The Debtor's

20

members will retain their membership interests in the Debtor following confirmation of the Plan and are not impaired under the Plan.  In order for the Debtor's Plan to be confirmed, unsecured creditors in Class 8 must vote in favor of the Plan.

## XII.  RECOMMENDATION

THE DEBTOR URGES YOU TO EXECUTE THE ENCLOSED BALLOT IN FAVOR OF ITS PLAN.

PODTBURG & SONS DAIRY, LLC


By: /s/ Jeff C. Podtburg                
        Jeff C. Podtburg, Manager/Member


Respectfully submitted,

WEINMAN & ASSOCIATES, P.C.


By: \s\ Jeffrey A. Weinman           
        Jeffrey A. Weinman, #7605
        William A. Richey, #13438
        730 17th Street, Suite 240
        Denver, CO 80202-3506
        Telephone: (303) 572-1010
        Facsimile: (303) 572-1011
        jweinman@epitrustee.com
        wrichey@weinmanpc.com
*Counsel for Debtor-in-Possession*
*Podtburg & Sons Dairy, LLC.*

22